# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **GLORIA WATTS,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:01-CV-2241-VEH** |
| | } | |
| **BELLSOUTH** | } | |
| **TELECOMMUNICATIONS,** | } | |
| **INC.,** | } | |
| | } | |
| **Defendant.** | | |

## MEMORANDUM OPINION

## I.    INTRODUCTION

This case arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 ("ERISA") and is pending on remand by the Eleventh Circuit as a result of its mandate issued on March 14, 2003.[1]  (Doc. #37).  The undersigned received the case by way of reassignment on June 24, 2005.  (Doc. #63).  Pending before the court are cross motions for summary judgment.  Plaintiff Gloria Watts filed her motion (Doc. #71) on March 2, 2006.  Defendant BellSouth Telecommunications, Inc. ("BellSouth') filed its motion (Doc. #72) on March 3, 2006.  As discussed more fully below, because the court concludes that the

---

[1] The court's decision on summary judgment is unrelated to the administrative exhaustion issues decided by the Eleventh Circuit in its mandate.

administrative decision to deny Plaintiff's claim for short-term disability benefits is *de novo* correct, Plaintiff's Motion for Summary Judgment is due to be denied, and BellSouth's Motion for Summary Judgment is due to be granted.

## II.      STANDARD OF REVIEW[2]

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *See id.* at 323.  Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories,

---

[2]Because the court's role in ERISA cases is more akin to an appellate one, the scope of its review on summary judgment is notably different than when it sits as a trial court.  *See Providence v. Hartford Life & Accident Ins. Co.*, 357 F. Supp. 2d 1341, 1342 n.1 (M.D. Fla. 2005) ("[T]he Court's task is to review the benefit decision based on the administrative record available to the decision maker at the time he or she made the decision.").

and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991) (en banc)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; *i.e.* facts that would entitle it to a directed verdict if not controverted at trial. *See Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes

such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires that the movant point out to the district court that there is an absence of evidence to support the non-moving party's case. *See Fitzpatrick*, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional

4

evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## III.   STATEMENT OF FACTS[3]

### A.   Introduction and Plan Provisions

Plaintiff Gloria Watts was employed as a Customer Service Representative for "BellSouth" and was a participant in the BellSouth Short Term Disability Plan (the

---

[3]Although there are cross-motions for summary judgment, each side must still establish the lack of genuine issues of material fact and that it is entitled to judgment as a matter of law.  *See Chambers & Co. v. Equitable Life Assur. Soc.*, 224 F.2d 338, 345 (5th Cir. 1955); *Matter of Lanting*, 198 B.R. 817, 820 (Bankr. N.D. Ala. 1996). The court will consider each motion independently, and in accordance with the Rule 56 standard.  *See Matsushita Elec. Indus. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  "The fact that both parties simultaneously are arguing that there is no genuine issue of fact, however, does not establish that a trial is unnecessary thereby empowering the court to enter judgment as it sees fit."  *See* Wright, Miller & Kane, *Federal Practice and Procedure* § 2720, at 327-28 (3d ed. 1998).  Also, these are the facts for summary judgment purposes only; they may not be the actual facts.  *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts.'") (citation omitted).

"STD Plan").   AF No. 1.1-1.2, 1.4.[4]   The STD Plan has delegated claims

administration to Kemper.[5]  AF No. 2.1.

Kemper determines eligibility for benefits based on the specific definition of

disability in the STD Plan.  AF No. 2.2.  Under the STD Plan:

> "Disability" means a medical condition which makes a Participant
> unable to perform any type of work as a result of a physical or mental
> illness or an accidental injury.   "Any type of work" includes the
> Participant's regular job with or without accommodations, any other
> Participating Company job (regardless of availability) with or without
> accommodations, or temporary modified duties.   "A Participating
> Company job" is any job within a Participating Company; or any job
> outside a Participating Company which is comparable in skills and

---

[4]The designation "AF" stands for admitted fact and indicates a fact offered by
BellSouth that Plaintiff has admitted in her written submissions on summary
judgment, in her deposition testimony, or by virtue of any other evidence offered in
support of her case.  Whenever Plaintiff has adequately disputed a fact offered by
BellSouth, the court has accepted Plaintiff's version.   The court's numbering of
admitted facts (e.g., AF No. 1) corresponds to the numbering of BellSouth's
Statement of Facts as set forth in Doc. #74 and responded to by Plaintiff in Doc. #75.
A number following a decimal point corresponds to the particular sentence within the
numbered statement of facts.  For example, (AF No. 1.2) would indicate the second
sentence of paragraph 1 of BellSouth's Statement of Facts is the subject of the court's
citation to the record.   Similarly, the designation "AAF" stands for additional
admitted fact and corresponds to Plaintiff's Statement of Facts contained in Doc. #72
and responded to by BellSouth in Doc. #76.  Any other facts referenced by the parties
that require further clarification are dealt with later in the court's opinion.

[5]As explained by BellSouth in its brief, subsequent to making the decisions at
issue herein, Kemper changed its corporate name to Broadspire Services, Inc.
Because the corporate name at the time of the decisions, and the name contained on
the administrative record, is Kemper, the court will refer to the claims administrator
herein as "Kemper" to avoid confusion.

functions.  A Participant subject to a Disability is referred to as being "Disabled."

AF No. 2.3.

The summary plan description ("SPD") for the STD Plan provides a similar definition, which Kemper is bound to apply, which states that a participant is disabled if he or she is "unable to perform any type work as a result of a physical or mental illness or an accidental injury."  AF No. 3.1.  As that phrase implies, any type work is defined broadly to include the employee's "regular job with or without accommodations, any other participating company job (regardless of availability) with or without accommodations, or temporary modified duties."  AF No. 3.2.

### B.    Plaintiff's Claim for Disability Benefits

Due to various medical conditions, Watts began a leave of absence in October, 2000.  AF No. 1.3.  Watts applied for benefits under the STD Plan after the applicable seven-day waiting period expired.  AF No. 1.4.  In considering Plaintiff's initial claim for STD benefits, Kemper's Case Manager received a mental health assessment from Dr. Joel Melvin, Plaintiff's treating clinical psychologist.  AF No. 5.1.  Kemper initially denied benefits in a letter dated November 6, 2000.  AF No. 5.2.  After receiving additional medical information from Dr. Melvin, Kemper reinstated benefits for the time period of October 23, 2000, through early December, 2000.  AF No. 6.

After examining his patient on December 8, 2000, Dr. Melvin completed a Behavioral Health Clinician Statement for Kemper. AF No. 7.1. In this report, Dr. Melvin checked off that his patient was able to perform specific examples of "Cognitive Functioning." For "Behavioral Control," he reported that Watts could apply practical judgment, use the telephone, and perform household activities such as shopping, preparing meals, and maintaining hygiene. AF No. 7.2. He indicated he expected significant improvement within a month. AF No. 7.3. He also stated that Watts indicated an increase in work demands and conflicts with her supervisor as specific problems in returning to work. AF No. 7.4.

Dr. Melvin additionally indicated on the form that Ms. Watts is disabled as a consequence of impaired affect modulation, impaired cognitive functioning, impaired volition and stamina, and self appraisal of incapacity. He diagnosed depressive mood, fatigue, hopelessness, lack of volution, and listed a current GAF of 55. AAF No. 48. Subsequently, Dr. Joel Melvin wrote Kemper a handwritten letter stating that Ms. Watts is disabled. AAF No. 49.

On December 12, 2000, Kemper sent a letter to Watts terminating her STD claim effective December 15, 2000, and indicating that "the medical evidence submitted does not support disability from any type of work, including modified

8

duties." AF No. 8.1.  However, Kemper also stated that benefits would continue to be paid pending an Independent Medical Examination ("IME").  AF No. 8.2.

Kemper then scheduled Ms. Watts for an IME through its IME coordinator, Claim Care.  AF No. 9.1.  Watts was examined on January 2, 2001, by licensed psychologist Julie McDonald, Ph.D.  Dr. McDonald noted that Watts's activity level was within normal limits, and her "interpersonal attitude was accessible and open." AF No. 9.2.  Her speech was "logical, relevant, and coherent."  She had no hallucinations.  AF No. 9.3.  She was able to perform certain cognitive tests, such as writing, counting backwards, etc.  AF No. 9.4.  She exhibited good judgment and average ability for abstraction.  AF No. 9.5.  She did not have obsessive-compulsive thoughts or behaviors.  AF No. 9.6.  Her verbal skill IQ was in the average range.  AF No. 9.7.  Her memory was in the low average to average range.  AF No. 9.8.

Dr. McDonald also reported that the MMPI-II should be viewed with extreme caution because of invalid results, but that Plaintiff's profile is indicative of someone "with severe feelings of guilt and depression, as well as some moodiness."  AAF No. 52. Dr. McDonald's report additionally listed Plaintiff's diagnostic conditions as:

1.    Major Depressive Disorder, Single Episode, Moderate to Severe.

2.    Panic Disorder without Agoraphobia.

3.     Migraine Headaches, Hypertension, Kidney problems due to medication, Irritable Bowel Syndrome.

4.     Occupational problems, Problems with Primary Support Group.

5.     GAF=55, Estimated GAF prior to work leave=45.

AF No. 53.

To support her disability claim, Plaintiff also relies upon the Behavioral Health Clinician statement made by Dr. McDonald.  AAF No. 50.  The report shows clinically significant cognitive impairment; clinically significant persistence, pace, and stamina impairment; and clinically significant impairment to activities of daily living.  AAF No. 55.

As part of her examination, Dr. McDonald completed a Functional Capacity Examination ("FCE") form.  AF No. 10.1.  Dr. McDonald noted no significant impairment in reality testing, emotional and behavioral control.  AF No. 10.2.  She indicated the ability to apply practical judgment.  AF No. 10.3.

Kemper also sent Dr. McDonald's IME report to a "peer physician," Dr. Barry Glassman.  AF No. 11.1.  Dr. Glassman is a psychologist who analyzes medical records for Kemper and provides his opinion regarding whether they demonstrate disability.  AF No. 11.2.  Dr. Glassman issued a report analyzing the IME, noting that there was only mild impairment to attention and concentration, and that emotional

10

and behavioral control failed to demonstrate any significant impairment.  AF No.

11.3.  He therefore concluded that the IME "does not support an acuity of illness

which would preclude any workability whatsoever."  AF No. 11.4.

On January 16, 2001, Kemper sent a letter to Watts confirming that benefits

remained denied.  AF No. 12.2.  The letter noted that the IME report "shows that you

have functionality and therefore [are] not eligible for short term disability benefits."

AF No. 12.3.

On March 9, 2001, Watts sent a letter to Kemper's appeals coordinator,

appealing the decision to deny benefits.  AF No. 13.1.  In the letter, she stated she

could not handle the stress and technical process of her job.  AF No. 13.2.

On May 9, 2001, Kemper sent a letter to Plaintiff confirming its prior decision,

and denying her appeal.   AF No. 14.1.   Kemper's letter contained a detailed

chronology of the medical information received.  AF No. 14.2.  This constituted the

final appeal determined by Kemper.  AF No. 14.3.  On September 5, 2001, Plaintiff

filed her Complaint in this action seeking additional disability benefits under the STD

Plan.  (Doc. #1).

11

## IV.   ANALYSIS

### A.   ERISA Standard of Review

Based upon the parties' summary judgment papers, a dispute exists over which ERISA standard of review the court should apply.  Plaintiff maintains that a modified arbitrary and capricious standard is applicable (*see Brown v. Blue Cross & Blue Shield of Ala.*, 898 F.2d 1556, 1566-67(11th Cir. 1990)), while BellSouth contends that the pure arbitrary and capricious standard is appropriate.  When this type of conflict arises, one of the critical inquiries for the court to evaluate is the financial structure of the benefits administration.  *See, e.g., Levinson v. Reliance Standard Ins. Co.*, 245 F.3d 1321, 1326 (11th Cir.2001) ("Because Reliance pays out to beneficiaries from its own assets, however, a conflict of interest exists between its fiduciary role and its profit making role. Thus, the proper standard in this case is a heightened arbitrary and capricious standard.").  In this regard, Plaintiff maintains that the Eleventh Circuit's decision in *Williams v. BellSouth Telecomms., Inc.*, 373 F.3d 1132, 1138 (11th Cir. 2004) controls the standard of review issue and that accordingly, BellSouth is collaterally estopped from challenging it.

In *Williams*, the Eleventh Circuit determined that a modified arbitrary and capricious standard should apply to the STD Plan.  In reaching this conclusion, however, the court did not treat the STD Plan as a trust vehicle.  Instead, the court

12

stated in a footnote:  "BellSouth's disability plan is not a trust or otherwise self funded.  Rather, any benefits are paid directly out of BellSouth's operating expenses. It is therefore, not in BellSouth's financial interest to approve disability benefit claims.").  *Id.* at 1135 n.4.

The court appreciates BellSouth's points that the trust status of the STD Plan was not pivotal to the lower court decision in *Williams* and did not ultimately impact the administrative decision to deny benefits, which despite the application of the modified and arbitrary standard, was affirmed on appeal.  The court also recognizes that while BellSouth does pay benefits out of its operating expenses, it is customarily reimbursed by the trust within twelve (12) days of a benefits payment.  However, regardless of whether collateral estoppel applies to BellSouth, this court is still bound by the Eleventh Circuit's decision in *Williams* regarding the proper standard for it to use because "'that holding is the law of this Circuit regardless of what might have happened had other arguments been made to the panel that decided the issue first.'" *See, e.g., Tippitt v. Reliance Standard Life Ins. Co.*, No. 05-14005, __ F.3d __, 2006 WL 2105986,  at *6 (11th Cir. July 31, 2006) (quoting *Cohen v. Office Depot, Inc.*, 204 F.3d 1069, 1076 (11th Cir.2000)).  "[BellSouth's] argument that [this court] should not be bound by *Williams* because this point was not really argued in that case runs afoul of [the Eleventh Circuit's] decisions that a prior panel precedent cannot be

circumvented or ignored on the basis of arguments not made to or considered by the prior panel." *Tippitt*, 2006 WL 2105986, at *6.

Against this backdrop, the court now reviews the benefits denial on a *de novo* basis to see if it even needs to reach further analysis relating to the perceived conflict issue. Under the review of denials framework set forth in *Williams*, 373 F.3d at 1138 (11th Cir. 2004),[6] the court reviews the administrative record and decides whether it

---

[6]In *Williams*, the Eleventh Circuit set forth a six-step model for use in judicially reviewing virtually all ERISA claim denials:

(1)    Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (*i.e.*, the court disagrees with the administrator's decision; if it is not, then end the inquiry and affirm the decision).

(2)    If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3)    If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4)    If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5)    If there is no conflict, then end the inquiry and affirm the decision.

14

either agrees or disagrees with the claims administrator's benefits-denial decision. If the court determines that the administrator's decision is correct, then summary judgment is due to be entered in favor of BellSouth.  However, if the court disagrees with Kemper's decision, then it looks to the level of discretion afforded to the administrator in reviewing claims and assesses whether a potential conflict of interest exists.  As explained above, this would require the court to apply the heightened arbitrary and capricious standard based upon the binding precedent of *Williams*.

### B.   *De Novo* Review of Plaintiff's Disability Claim

"In step two, regardless of whether arbitrary and capricious review or the heightened form of that standard of review applies, the court reviews *de novo* the claims administrator's interpretation of the plan to determine whether it is 'wrong.'" *Tippitt*, 2006 WL 2105986, at *3 (citation omitted).  "'Wrong' is the label used by our precedence to describe the conclusion a court reaches when, after reviewing the plan documents and disputed terms *de novo*, the court disagrees with the claims administrator's plan interpretation.'" *Id.* (quoting *HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 993 n.23 (11th Cir. 2001)).

---

(6)    If there is a conflict of interest, then apply heightened arbitrary
       and capricious review to the decision to affirm or deny it.

*Williams,* 373 F.3d at 1138 (footnotes omitted).

1.    The background and substance of this case resemble *Williams* in several ways.

In *Williams*, despite determining that the modified arbitrary and capricious standard applied, the court concluded the insurer was correct in its decision to deny benefits under a *de novo* review, and affirmed the district court's grant of summary judgment to BellSouth:

> Turning back to the instant case, we note that Kemper reviewed the medical records of several doctors, including Williams's own doctor, Dr. Michael Holt, in making its benefits-denial decision. None indicated that Williams was completely incapable of working. Kemper also had Williams examined by an independent medical examiner (IME), Dr. Charles Whestall. She indicated to Whestall that she was engaging normally in the significant activities of daily living, including caring for two young children and a granddaughter, cooking all meals, performing housework, tending to finances, and attending religious services. And instead of claiming that she could not work at all, she said that she would like to change to a less stressful job. Whestall concluded from her testing that her stress was "not overwhelming her capacity for coping." Accordingly, we cannot say that Kemper's no-disability determination was *de novo* wrong under the terms of BellSouth's disability plan. Unlike the plan administrator in *Levinson*, Kemper thoroughly gathered and reviewed medical evidence concerning Williams's condition, including that of an IME.

373 F.3d at 1139.

A comparison of the actions taken by Kemper in the *Williams* case with the actions of Kemper in this lawsuit reveals that Kemper again "thoroughly gathered and reviewed medical evidence concerning [Plaintiff's] condition[.]"  For example,

Kemper retained an independent psychologist, namely Dr. McDonald, to examine Plaintiff and give an opinion on her condition.  The IME performed by Dr. McDonald showed that while Plaintiff suffered from some impairment, she also had functioning on a cognitive level, an open interpersonal attitude, logical and relevant speech, good judgment and no hallucinations.  Kemper also had Plaintiff's IME reviewed by Dr. Glassman, another psychologist, who confirmed that Plaintiff was ineligible to receive disability benefits under the STD Plan.

Also comparable to *Williams*, the court is not faced with a situation in which the language defining disability pursuant to the STD Plan is ambiguous such that there are multiple reasonable interpretations of what the term means.  *See Lee v. Blue Cross/Blue Shield of Ala.*, 10 F.3d 1547, 1551 (11th Cir. 1994) ("Having determined that the plan is ambiguous, we hold that application of the rule of contra proferentem is appropriate in resolving ambiguities in insurance contracts regulated by ERISA.") (citing several opinions from sister circuits).  Therefore, unlike *Tippitt*, because disability, as defined  under the STD Plan does not present the court with conflicting, but reasonable constructions of the term, the rule of contra proferentem is not triggered.

Moreover (and similar to the claimant in *Williams*, who was "engaging normally in the significant activities of daily living, including caring for two young

17

children and a granddaughter, cooking all meals, performing housework, tending to finances, and attending religious services"), Plaintiff's own treating clinical psychologist, Dr. Melvin, indicated that she "had cognitive functioning, could apply practical judgment, was able to use the telephone, and perform household activities such as shopping, preparing meals, and maintaining hygiene." Dr. Melvin also reported that Plaintiff indicated (akin to the claimant in *Williams*, who preferred a less stressful job) that "an increase in work demands and conflicts with her supervisor" were specific problems relating to her difficulty with returning to work.

> 2.    Plaintiff's treating psychologist's opinions do not establish that she is disabled under the STD Plan, and regardless, they are due no special deference under ERISA.

The mere use of the term "disabled" or the generation of a list of diagnoses by Plaintiff's treating doctor does not satisfy the definition of disability under the STD Plan because neither record substantiates Plaintiff's inability to perform "any type of work." Similarly, Dr. Melvin's descriptions of Plaintiff's abilities do not substantiate Plaintiff's inability to perform "any type of work"—instead, and to the contrary, they help to bolster the correctness of the decision to deny benefits. Additionally, a reviewing psychologist for Kemper, Dr. Glassman, has concluded that the IME performed by Dr. McDonald "does not support an acuity of illness which would

18

preclude any workability whatsoever."  Although Plaintiff challenges the sufficiency of Dr. Glassman's opinion because he conducted a paper review only, as the United States Supreme Court has clarified, in the area of ERISA, opinions of treating physicians are not entitled to any greater deference than those of reviewing physicians. *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 832-33 (2003) (acknowledging division among Circuits and determining that so-called treating physician rule, as developed for review of disability claims under the Social Security Act,  42 U.S.C. § 231, *et seq.*, and subsequently adopted by the Commissioner of Social Security, does not apply in ERISA cases).

> 3.  Kemper's requirement that Plaintiff provide objective evidence substantiating her inability to perform any work is not *de novo* wrong.

Nor is the court persuaded by Plaintiff's arguments that the requirement to substantiate an inability to work through objective evidence is *de novo* wrong.  More specifically, Plaintiff points out that Kemper's letter to her dated August 1, 2000, which indicated that she no longer qualified for short-term disability benefits, also advised her that "objective data that supports your inability to perform any type of

work must be obtained in order to be eligible for benefits."[7]  Doc. #46 at Ex. 15 at BST 0097.

The court is aware of case authority recognizing that an administrator may act arbitrarily and capriciously when it denies a claim solely on the lack of objective evidence when an "insured suffers from a recognized debilitating disease which is commonly known to defy quick and easy diagnosis, which has no 'dipstick' test, and which regularly baffles physicians by its impairing symptoms in light of unremarkable medical test results."  *See, e.g.*, *Howell v. Continental Casualty Co.*, 4:99-CV-1842-RBP, (N.D. Ala. Dec. 20, 1999) (Doc. #23 at 13-14).  However, unlike the plaintiff in *Howell*, who was diagnosed with chronic fatigue syndrome ("CFS"), and other claimants with similar diagnoses of chronic pain syndrome and fibromyalgia, Plaintiff has not shown that she suffers from any of these conditions or some other equally and commonly "recognized debilitating [but diagnosis-defying] disease."

Moreover, there is persuasive authority which embraces the objective evidence standard as it relates to the substantiation of a claimant's disabled status (and even

_____

[7]Similarly, the SPD for the STD Plan indicates that to qualify for STD benefits, a claimant must "[a]s required by the STDP representative, furnish satisfactory evidence of your disability."  (Doc. #46 at Ex. 11 at BellSouth 3105).

applying the requirement in the context of difficult to diagnose diseases identified

above):

> The requirement that a plaintiff submit objective evidence of the impact
> of a diagnosed disease, illness or other condition is logical and
> necessary, especially in the case of diagnoses such as CFS. The
> objective-evidence requirement promotes integrity in the application of
> the law. It assures claimants are treated fairly and with parity by
> providing that coverage decisions are not based on varying subjective
> expressions by claimants of a disease, illness or condition with which
> they have been diagnosed. That is, it requires claimants to establish that
> the diagnosed disease, illness or condition results in an actual disability,
> not just a perceived one. The requirement of objective evidence also
> promotes integrity by assuring there is corroboration for a claimant's
> subjective complaints, thus deterring embellished allegations of the
> effect of the diagnosed malady as well as deterring fraud in the claims
> process.   Accordingly, the Court finds the Coca-Cola Defendants
> appropriately required Plaintiff to provide objective evidence of the
> effects of her CFS and thus properly construed the medical certification
> requirement of the Plan in denying Plaintiff's claim.

*See, e.g., Brucks v. Coca-Cola Co.*, 391 F. Supp. 2d 1193, 1205 (N.D. Ga. 2005)

(footnote omitted); *see also Boardman v. Prudential Insurance Company of America*,

337 F.3d 9, 17 n.5 (1st Cir. 2003) ("[The administrator] did not require [the plaintiff]

to present objective medical evidence to establish her illnesses. . . .  Rather, [it]

wanted objective evidence that these illnesses rendered her unable to work.").

Therefore, the requirement that Plaintiff submit objective evidence to support her

claim that her medical conditions prevented her from performing any type of work is not *de novo* wrong.[8]

        4.    In sum, Plaintiff has not met her burden under ERISA.

A participant or beneficiary seeking benefits under the terms of an ERISA-governed plan bears the burden of establishing that he or she is entitled to such benefits. 29 U.S.C. § 1121(a)(1)(B); *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 658 (11th Cir. 1992). Under the terms and conditions of the STD Plan, this means that Plaintiff must demonstrate that she was "unable to perform any type of work [including: (i) her specific job, (ii) any other job within the Participating Company, (iii) any job with comparable skills and functions outside of the Participating Company, or (iv) a job with temporary modified duties] as a result of a physical or mental illness or an accidental injury." Based upon the information in

---

[8]Plaintiff's reliance upon *Godfrey v. BellSouth Telecommunications, Inc.*, 89 F.3d 755 (11th Cir. 1996) is misplaced. *Id.* at 758 ("The plan administrators testified that they accepted the diagnoses of Godfrey's condition from her doctors, but, as one of BST's medical consultants stated, 'pain alone does not substantiate disability.'"). First, unlike Plaintiff, the claimant in *Godfrey* suffered from fibromyalgia, a condition which is significantly distinguishable as discussed above. Second, and dissimilar to *Godfrey*, Kemper's reason for denying Plaintiff's claim under the STD Plan did not turn upon a conclusion that pain cannot be disabling but, rather, that Plaintiff has not shown how her conditions, including pain, render her disabled under the STD Plan.

the record at the time of the administrator's decision, Plaintiff is unable to make such a showing as a matter of law.

## V.    CONCLUSION[9]

Because the court is persuaded that the denial of Plaintiff's claim for  short - term disability benefits is *de novo* correct under the STD Plan, BellSouth has met its burden of demonstrating the absence of material disputed facts and entitlement to judgment as a matter of law.  Conversely, Plaintiff has not.  Accordingly, the court will enter an order granting summary judgment in favor of BellSouth and denying summary judgment to Plaintiff.

**DONE** and **ORDERED** this 28th day of August, 2006.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

---

[9]Because the court determines that BellSouth is entitled to summary judgment on Plaintiff's disability claim under the STD Plan, it does not reach Plaintiff's additional claim for long-term disability benefits.

23